UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 08-01916-MD-MARRA/JOHNSON

IN RE:  CHIQUITA BRANDS
INTERNATIONAL, INC. ALIEN
TORT STATUTE AND SHAREHOLDER
DERIVATIVE LITIGATION
_____/

This Document Relates To:

ATA ACTION
_____/

NO. 08-20641-CIV-KAM

TANIA JULIN, *et al.,*

Plaintiffs,

v.

CHIQUITA BRANDS INTERNATIONAL, INC.,
_____/

## ORDER AND OPINION

THIS CAUSE is before the Court on Defendant's Motion to Dismiss Amended

Complaint (DE 31).  The Court has reviewed the motion, response, reply, and supplemental

briefing and is otherwise fully advised in the premises.

Plaintiffs are United States citizens and the estates, survivors, and heirs of deceased

United States citizens who allegedly were kidnaped, held hostage, and murdered by the

Colombian terrorist organization known as Fuerzas Armadas Revolucionarias de Colombia

("FARC").  Plaintiffs bring this action against defendant, Chiquita Brands International, Inc.,

1

("Chiquita"), alleging that defendant is civilly liable to the plaintiffs for damages, pursuant to 18

U.S.C. § 2332[1] because it (1) aided and abetted the homicide and serious bodily injury of

American Nationals located outside the United States in violation of 18 U.S.C. § 2333[2] (Count I);

(2) conspired to violate 18 U.S.C. § 2332 in violation of 18 U.S.C. § 2333 (Count II); provided

material support or resources to terrorists in violation of 18 U.S.C. § 2339A[3] and in violation of

---

[1] The statute reads, in relevant part:

(a) Homicide.--Whoever kills a national of the United States, while such national is outside the United States, shall--

    (1) if the killing is murder (as defined in section 1111(a)), be fined under this title, punished by death or imprisonment for any term of years or for life, or both;

    (2) if the killing is a voluntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than ten years, or both; and

    (3) if the killing is an involuntary manslaughter as defined in section 1112(a) of this title, be fined under this title or imprisoned not more than three years, or both.

(b) Attempt or conspiracy with respect to homicide.--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--

    (1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

    (2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

(c) Other conduct.--Whoever outside the United States engages in physical violence--

    (1) with intent to cause serious bodily injury to a national of the United States; or

    (2) with the result that serious bodily injury is caused to a national of the United States; shall be fined under this title or imprisoned not more than ten years, or both.

[2] The statute reads, in relevant part: (a) Action and jurisdiction.--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

[3] The statute reads, in relevant part:  (a) Offense.--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (I), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a,

2

18 U.S.C. § 2333(a) (Count III).  Plaintiffs also allege causes of action against Chiquita for wrongful death, aiding and abetting wrongful death, false imprisonment, aiding and abetting false imprisonment, intentional infliction of emotional distress, aiding and abetting intentional infliction of emotional distress, negligent infliction of emotional distress, assault, and aiding and abetting assault under various state tort laws (Counts IV-XXIV).

## Factual Background[4]

*The FARC*

The FARC, established in 1964 by the Colombia Communist Party as its "military wing," is Colombia's largest rebel group and has committed thousands of ransom kidnapings in Colombia, often targeting innocent civilians.  Compl. ¶¶ 173, 174, 176, 180.  FARC is a union of communist militants and peasant self-defense groups.  FARC is comprised of 15,000 to 18,000 members, organized into approximately 64 "frentes" or fronts, and operating primarily in sparsely populated areas in Colombia. Compl. ¶ 174.  FARC claims to represent the rural poor against Colombia's wealthy classes, and opposes the influence of the United States in Colombia, the privatization of natural resources, and multinational corporations. Compl. ¶ 175.

---

2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

[4] For purposes of the present motion, the Court must assume all the allegations of Plaintiff's Amended Complaint to be true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).

FARC supports its operations through kidnapings, extortion, drug trafficking and "war taxes" it collects from residents, businesses and landowners.  Compl. ¶¶ 177-78.  In addition to kidnaping twenty-three Americans between 1994 and 1997 alone, FARC has also committed many murders, including killing Americans.  Compl. ¶¶ 180-82.  During the period relevant to this action, FARC held significant influence over, controlled, or was fighting other terrorist organizations for control of labor unions in Colombia's banana growing regions.  Compl. ¶¶ 179, 198.

On October 8, 1997, the U.S. Secretary of State designated FARC a Foreign Terrorist Organization ("FTO"), a designation that still remains today.  This designation was based in part on the U.S. Department of State's conclusion that FARC committed "bombings, murder, kidnaping, extortion, hijacking, as well as terrorist and conventional military action against Colombian political, military and economic targets."  Compl. ¶ 185.  At the same time, the European Union and Colombian governments also designated FARC as a terrorist organization. Compl. ¶ 183-85.

*The Kidnapings and Murders of the Five Missionaries*

FARC kidnaped, held hostage, demanded ransom for, and ultimately murdered Mark Rich, Charles David Mankins, Jr., Richard Lee Tenenoff, Stephen Welsh and Timothy Van Dyke, American citizens who were members of plaintiff New Tribes Mission ("NTM"), an international Christian missionary organization.  Compl. ¶¶ 1, 11-14.

On January 31, 1993, in the Panamanian village of Púcuro, FARC terrorists burst into Mark Rich's home, pointed guns at him, his family and some villagers who were visiting, and forcibly removed him from his home. Compl. ¶¶ 54-66.  Shortly thereafter, FARC terrorists

entered the Mankins' home, and attacked, subdued, and forcibly removed Dave Mankins. Compl. ¶¶ 67-80.  At the same time, FARC terrorists entered the Tenenoff's home, pointed a gun at Rick Tenenoff's head and forcibly removed him.  Compl. ¶¶ 81-89.  During the course of these incidents, the FARC members terrorized everyone, threatening the wives, frightening the children, and intimidating the villagers.  Compl. ¶¶ 54-93.  Approximately one week after the kidnapings, FARC terrorists radioed NTM and demanded a $5,000,000.00 ransom for the men's return. Compl. ¶ 100.  Negotiations ensued, with FARC threatening that the men would be harmed if the ransom were not paid.  The ransom was not paid. Compl. ¶ 1102-105.  After years of efforts from plaintiffs to learn the whereabouts of the men, in December 2000, NTM officials informed Tania Rich, Nancy Mankins and Patti Tenenoff that FARC had murdered their husbands in 1996, a fact not confirmed by the Colombian government until February of 2007. Compl. ¶¶ 110-11.

On January 16, 1994 in Villavicencio, Colombia, FARC terrorists forcibly removed Stephen Welsh and Timothy Van Dyke from their homes and families at gunpoint.  Compl. ¶¶ 120-26.  After rounding people up and frightening them, the terrorists placed the two missionaries in a Jeep and drove them off into the hills.  Compl. ¶¶ 127-143. Within a month of the kidnapings, FARC terrorists contacted NTM and demanded a $3,000,000.00 ransom for the men's safe return. Compl. ¶ 144.  The families did not pay the ransom, nor did they agree or negotiate to pay any ransom. Compl. ¶ 146.  On June 19, 1995, the men were killed by the FARC's 53rd Front near Cundinamarca, Colombia, during a firefight with a Colombian army unit. Compl. ¶ 147.  Evidence, including eyewitness testimonies collected by the Colombian National Prosecutor and the U.S. Attorney General's Office, confirmed that FARC had executed

the men.  Compl. ¶¶ 147-48.  On February 7, 2007, the Colombian National Prosecutor's Office released a report concluding that all five missionaries were kidnaped, held hostage, and eventually murdered by FARC. Compl. ¶ 171.

*Chiquita's Payments and Provisions to FARC: 1989-1997*

Chiquita is a multinational corporation incorporated in New Jersey and headquartered in Cincinnati, Ohio. Compl. ¶ 44.  Chiquita produces, markets, and distributes bananas and other fresh produce. Compl. ¶ 46.  Chiquita is one of the largest banana producers in the world and is a major supplier of bananas throughout North America and Europe. Compl. ¶ 46.  It has operations throughout the world, including in Colombia, where it operated through its wholly-owned subsidiary, C.I. Bannanos de Exportacion, S.A. ("Banadex") until approximately May 2004. Compl. ¶ 44.  At all times relevant hereto, Banadex was Chiquita's controlled subsidiary, agent and/or alter ego. Compl. ¶ 45. At all relevant times, Chiquita had over 200 farms in Colombia dedicated to banana production. Compl. ¶ 48.

From 1989 through at least 1997, Chiquita knowingly and intentionally made numerous and substantial secret payments to FARC, and also provided FARC with weapons, ammunition and other supplies through its transportation contractors.  Chiquita did so knowing, or consciously avoiding, the fact that FARC was a violent terrorist organization. Compl. ¶ 191. Chiquita's payments to FARC, which began as cash at FARC's request, escalated into regular monthly payments ranging from $20,000.00 to $100,000.00.  Over time, the payments were fixed to a percentage of Banadex's gross revenues, with as much as ten percent being diverted to FARC. Compl. ¶ 192.

Chiquita went to great lengths to hide its relationship with FARC.  Compl. ¶¶ 191-96.

The payments were often delivered by a former American military pilot known as "Kaiser," who held a management position with Chiquita in Colombia. Compl. ¶ 193.  In order to conceal the payments, Chiquita placed false names and non-existent employees on its payroll, providing the funds on local paydays to regional FARC commanders.  Compl. ¶ 194.  Chiquita also assisted and/or advised FARC terrorists on how to create front organizations, enabling Chiquita to continue to channel funds to FARC and to mislead law enforcement, regulators, auditors, and anyone else who might examine Chiquita and Banadex's books and records.  Compl. ¶ 195. Chiquita also drew up fictitious contracts with legitimate operating organizations or, alternatively, overvalued existing contracts it maintained with such organizations.  This was done for the express purpose of hiding its secret payments to FARC.  Compl. ¶ 194-96.

Chiquita also worked with FARC-controlled labor unions, such as Sintrabanano, as another means of channeling payments to FARC.  Compl. ¶ 197.  Chiquita also collaborated with FARC and assisted FARC in subverting many local labor unions, and wresting control of local labor unions from other terrorist organizations.  Compl. ¶¶ 198.  In doing so, Chiquita anticipated and strived to obtain a competitive advantage over other banana growers facing less accommodating unions. Compl. ¶ 198.  FARC also helped Chiquita by harassing its competitors in the region.  Compl. ¶ 199.  In addition, Chiquita funneled weapons to FARC (and assisted FARC in the transport of weapons) through Chiquita's local transportation contractors.  Compl. ¶ 202.

*Chiquita's March 19, 2007 Guilty Plea*

On March 19, 2007, Chiquita pled guilty to violating U.S. anti-terrorism laws by funding another Colombian terrorist organization, the AUC.  In so doing, Chiquita acknowledged that it

had for years made payments to FARC as well.  Compl. ¶¶ 201, 205.  Chiquita admitted to using many tactics similar to those alleged above as a means of disguising and hiding its AUC payments.  Later, in 2007, as part of the sentence imposed on it pursuant to the guilty plea, Chiquita agreed to pay a $25 million fine to the U.S. government.  Compl. ¶ 206.  On May 11, 2008, CBS News broadcast a 60 Minutes report on Chiquita's payments to terrorists in Colombia, in which Chiquita's Chief Executive Officer, Fernando Aguirre, admitted that Chiquita hid its payments to the terrorists so well that: "if we hadn't gone to the Justice Department, we probably would not be here talking about this whole issue.  No one would know about this."  Compl. ¶ 213; Exhibit A at 7.

Until March 14, 2007, none of the Plaintiffs had any knowledge of Chiquita's payments and provisions to the FARC.  Compl. ¶ 200.  Moreover, Plaintiffs could not have discovered Chiquita's payments and provisions to the FARC by the exercise of reasonable dilligence because Chiquita actively and fraudulently concealed theses activities.  Compl. ¶ 200.

**Standard of Review**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).  To satisfy the pleading requirements of Federal Rule of Civil Procedure 8, a complaint must contain a short and plain statement showing an entitlement to relief, and the statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citing Fed. R. Civ. P. 8); see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005).

This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." Sams v. United Food and Comm'l Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir. 1989).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Id. at 1965. Plaintiff must plead enough facts to state a plausible basis for the claim. Id.

### Discussion

Chiquita moves to dismiss Plaintiffs' Amended Complaint for failure to state a claim. First, Chiquita argues that these claims are time barred under the applicable statutes of limitations. In addition, Chiquita argues that Plaintiffs cannot allege facts sufficient to demonstrate that the payments made by Chiquita to the FARC constituted "an act of international terrorism." Chiquita also asserts that Plaintiffs cannot allege facts sufficient to demonstrate that

9

the deaths of the American citizens at issue were "by reason of" the payments.  Chiquita claims

that Plaintiffs' state law claims are similarly deficient.

*Statute of Limitations*

Defendant moves to dismiss Plaintiffs' claims under the Antiterrorism Act, 18 U.S.C. §

2331 et seq. ("ATA") (Counts I-III) on the grounds that they are barred by the four year statute of

limitations. 18 U.S.C. § 2335(a).  Plaintiffs argue that the claims are subject to the tolling

provisions of 18 U.S.C. § 2335(b), as well as equitable tolling principles and the

diligence-discovery rule of accrual.

a.  *Statutory Tolling pursuant to 18 U.S.C. § 2335(b)*

18 U.S.C. § 2335(b) provides for tolling of the four-year statute of limitations period for

actions brought under § 2333(a), as follows:

> The time of the absence of the defendant from the United States or from any
> jurisdiction in which the same or similar action arising from the same facts may
> be maintained by the plaintiff, or of any concealment of the defendant's
> whereabouts, shall not be included in the 4-year period set forth in subsection (a).

Plaintiffs argue that their ATA claims are subject to statutory tolling under 18 U.S.C. §

2335(b).  Plaintiffs assert that until its March 2007 guilty plea, Chiquita successfully concealed

its causal connection to Plaintiffs' injuries (as a material supporter of the FARC), resulting in its

concealment as a defendant.  Thus, Plaintiffs contend that Chiquita concealed its "whereabouts"

within the meaning of § 2335(b).  Plaintiffs point to the Senate Report accompanying and

explaining the ATA, which construes the provision for "concealment of the defendant's

whereabouts," as follows:

> This section provides for a 4-year statute of limitations, but in recognition of the
> peculiar characteristics of terrorism, it tolls the limitation during any periods when

10

the terrorists have concealed their acts or identities or remain outside the United
States.

S. REP. NO 102-342, pt. V., at 46 (1992).  Plaintiffs note this interpretation of 18 U.S.C. §

2335(b) is consistent with the broad purpose of the ATA to remove hurdles to a plaintiff's civil

action against those who contribute to terrorist acts.  See 136 Cong. Rec. 7592 (1990) (statement

by ATA sponsor Sen. Charles E. Grassley urging passage of original ATA bill because

"[u]nfortunately, victims who turn to the common law of tort or Federal statutes, find it virtually

impossible to pursue their claims because of reluctant courts and numerous jurisdictional

hurdles").

        The Court rejects Plaintiffs' interpretation of the statute and finds that their claims are not

subject to statutory tolling.  "When the words of a statute are unambiguous, then, this first canon

is also the last: 'judicial inquiry is complete.' " Connecticut Nat. Bank v. Germain. 503 U.S. 249,

253 (1992) (quoting Rubin v. U.S., 449 U.S. 424, 430 (1981)); see also Exxon Mobil Corp. v.

Allapattah Services, Inc., 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the

authoritative statement is the statutory text, not the legislative history or any other extrinsic

material.  Extrinsic materials have a role in statutory interpretation only to the extent they shed a

reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.") The

Court agrees with the analysis in the opinion Strauss v. Credit Lyonnais, S.A., 2007 WL

2296832, *3-4 (E.D.N.Y. 2007), that the concealment of "whereabouts" provision in 18 U.S.C. §

2335(b) is restricted to physical concealment, not concealment of a defendant's identity as an

alleged tortfeasor.  See also Litle v. Arab Bank, PLC, 507 F.Supp.2d 267, 273 (E.D.N.Y. 2007)

("That toll does not encompass the concealment of a defendant's acts.")

11

*b. Equitable Tolling*

As Plaintiff's statutory tolling argument fails, the Court will next determine whether equitable tolling principles may apply to Plaintiffs' ATA claims.  "'Equitable tolling' is a doctrine under which plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to inequitable circumstances." Ellis v. General Motors Acceptance Corp. 160 F.3d 703, 706 (11th Cir. 1998).  Unlike the diligence-discovery rule, which postpones accrual of a claim, the doctrine of equitable tolling suspends the statute of limitations once a claim has accrued. Litle, 507 F.Supp.2d at 276.  Chiquita asserts that 18 U.S.C. § 2335(b) is the exclusive tolling provision applicable to ATA claims.  Plaintiffs, on the other hand, argue that statutory tolling and equitable tolling peacefully coexist with regard to the ATA.

The general rule is that equitable tolling principles apply to all federal causes of action where time limits are in the character of a true statute of limitations.  In re International Administrative Services, Inc., 408 F.3d 689, 701 (11th Cir. 2005).  See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95-96 (1990) (framing a general rule that all statutes of limitations are subject to a rebuttable presumption that equitable tolling applies).  However, equitable tolling is unavailable where it would conflict with the text of the relevant statute.  U.S. v. Beggerly, 524 U.S. 38, 48 (1998) (holding that the Quiet Title Act already effectively allowed for equitable tolling by providing that the statute of limitations would not begin to run until the plaintiff "knew or should have known of the claim of the United States"); United States v. Brockamp, 519 U.S. 347 (1997) (holding that Congress intended no equitable tolling to apply to the IRS code limitation based on the detailed technical language of the statute, iterations of the limitation in

12

procedural and substantive form and the explicit listing of exceptions).

Here, the Court rejects Defendant's contention that the statutory tolling provision of § 2335(b) is inconsistent with the application of equitable tolling to Plaintiffs' ATA claims. The language of § 2335(b) contemplates a defendant whose existence is known and is essentially unable to be sued under the circumstances. If a plaintiff does not know of a defendant, the defendant's absence from the jurisdiction is immaterial. It does not follow logically that the statutory tolling provision would preclude the application of equitable tolling principles to someone about whom a plaintiff does not know or someone who has concealed his involvement. Thus, 18 U.S.C. § 2335(b) is not inconsistent with, nor does it foreclose, Plaintiffs' assertion of equitable tolling. The Court will next address whether Plaintiffs have adequately pled equitable tolling of the applicable limitations period.

Plaintiffs claim that, under general principles of equitable tolling for fraudulent concealment, the running of the statute of limitations was tolled by the Defendant's systematic, long-running, and successful concealment of its connection to the FARC. "[E]quitable tolling is an extraordinary remedy that obliges plaintiffs to satisfy their burden of showing 'extraordinary circumstances' that are both beyond their control and unavoidable even with diligence." Taylor v. Holiday Isle, LLC, 561 F.Supp.2d 1269, 1276 (S.D. Ala. 2008). Equitable tolling is available and appropriate where the plaintiff untimely files his complaint because of "extraordinary circumstances that are both beyond his control and unavoidable even with diligence." Sandvik v. U.S., 177 F.3d 1269, 1271 (11th Cir. 1999). The burden rests with a plaintiff to show that equitable tolling is warranted. Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 661 (11th Cir. 1993). "[T]he applicability of equitable tolling is a fact-based decision" which must be

13

determined "on a case-by-case basis." In re International Administrative Services, Inc., 408 F.3d at 701-02.

Equitable tolling is appropriate where a plaintiff "remain[s] in the dark without any fault or want of diligence or care on his part." In re Olsen, 36 F.3d 71, 73 (9th Cir. 1994). "When a defendant's fraudulent deceptions leave a plaintiff ignorant of the facts or even existence of his claim, the limitations period is tolled until discovery of the fraud." In re International Administrative Services, Inc., 408 F.3d at 701. To invoke the doctrine of equitable tolling based on a defendant's fraudulent concealment of its conduct, "plaintiffs must establish that: (1) the defendant wrongfully concealed material facts relating to its wrongdoing; (2) the concealment prevented plaintiffs' discovery of the nature of the claim within the limitations period; and (3) the plaintiffs exercised due diligence in pursuing the discovery of the claim during the period they seek to have tolled." Litle, 507 F.Supp.2d at 276-77. Due diligence by the plaintiff is insufficient alone, and equitable tolling does not apply to "garden variety" claims of excusable neglect. Justice v. U.S., 6 F.3d 1474, 1479-80 (11th Cir. 1993); see also Covey v. Arkansas River Co., 865 F.2d 660, 662 (5th Cir. 1989) ("It is a common maxim that equity is not intended for those who sleep on their rights").

Here, the Complaint contains twelve detailed paragraphs alleging Chiquita's furtive, secret payments, including large sums of cash personally transported and made by a senior Chiquita employee on a regular basis; falsification of names and non-existent employees on Chiquita's payroll to provide funds to regional FARC commanders on local paydays; assistance in creating false front organizations and dummy corporations to channel funds; creation of fictitious contracts with legitimate organizations or overvaluation of existing contracts to bury

14

secret payments in its bookkeeping; cooperation with FARC-controlled labor unions, including Sintrabanano, to channel payments to FARC, funneling weapons to FARC and assistance of the transport of weapons through Chiquita's local transportation contractors; payments to AUC through intermediaries known as "convivirs"; making false and misleading entries on its books and records; and filing false and/or misleading documents with the Colombian and United States governments.  See Compl. ¶¶ 193-198, 202-206, 208, 212.  Taking the allegations in the complaint as a whole, the Court concludes that Plaintiffs have sufficiently pled the doctrine of fraudulent concealment in an effort to avoid application of the statute of limitations.  Whether the limitations period should be tolled is a factual question which cannot be resolved on a motion to dismiss.

### c. Accrual and the Diligence-Discovery Rule

Section 2335(a) of Title 18 of the United States Code provides for a four-year statute of limitations period for actions brought under § 2333(a), requiring that such actions be "commenced within 4 years after the date the cause of action accrued."  The statute is silent as to when an ATA action accrues.

Chiquita takes the position that all of Plaintiffs' claims accrued in the 1990's or, at the latest in 2000, when Plaintiffs allege that they learned that their relatives had been murdered by the FARC.  Therefore, Chiquita asserts that the four-year period in § 2335(a) expired long before the suit was filed. See Rotella v. Wood, 528 U.S. 549, 555 (U.S. 2000) ("But in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.")

Plaintiffs, in contrast, argue that, under the discovery rule of accrual, the four-year

limitations period did not start running until the disclosure of Chiquita's guilty plea on March 19, 2007.  See Diaz v. U.S., 165 F.3d 1337, 1340) (11th Cir. 1999) (extending diligence-discovery accrual rule to wrongful death claims brought under the Federal Tort Claims Act and holding that where the facts regarding causation were in the hands of the tortfeasor or "otherwise difficult to obtain," the claim accrues "when the plaintiff knows, or exercising reasonable diligence should know, both of the decedent's death and its causal connection" with the tortfeasor).  Plaintiffs contend that, even with the exercise of due diligence, they did not and could not have discovered Chiquita's connection to FARC and its terrorist activities, or Plaintiffs' resulting injuries, before then. See Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 832-33 (11th Cir. 1999) (suggesting that a plaintiff's due diligence revolves around the question of whether the plaintiff "would have discovered adequate ground for filing" the lawsuit during the limitations period).

The Court need not resolve the question of how to apply the diligence-discovery rule of accrual at this time.  Regardless of when the causes of action accrued, Plaintiffs have pled sufficient facts to raise a question of equitable tolling based upon fraudulent concealment.  See supra.  Thus, questions of fact are present which preclude dismissal as a matter of law.

*Plaintiff's Allegations of Civil Claims Under the ATA*

Enacted as part of the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2333 provides a cause of action for American nationals injured in their person, property, or business by reason of an act of international terrorism.  The statute reads, in relevant part: (a) Action and jurisdiction.--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the

16

damages he or she sustains and the cost of the suit, including attorney's fees.18 U.S.C. § 2333(a).

*International Act of Terrorism*

Chiquita argues that Plaintiffs' allegations are insufficient because they fail to plead "an act of international terrorism," as required by 18 U.S.C. § 2333(a).  The Court rejects Chiquita's contention.

Section 2333(a) provides that any national of the United States injured "by reason of an act of international terrorism" may sue for damages.  Contrary to Chiquita's argument, Plaintiffs need not allege that Chiquita committed the act of terrorism.  While ultimately Chiquita's liability will depend  on whether its alleged conduct in assisting the FARC can be said to have caused Plaintiffs' injuries, there can be no dispute that Plaintiffs have adequately pled that they were injured by acts of international terrorism.  See Linde v. Arab Bank, PLC, 384 F.Supp.2d 571, 581 (E.D.N.Y. 2005).

Section 2331(1) of the ATA defines "international terrorism" as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended-
    (I) to intimidate or coerce a civilian population;
    (ii) to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination or kidnaping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

 Plaintiffs allege that FARC was designated in 1997 as a Foreign Terrorist Organization

("FTO) pursuant to 8 U.S.C. § 1189 by the United States Secretary of State and currently remains a designated FTO.[5]  Comp. ¶ 183-84.  When the Secretary of State issued FARC's FTO designation, the U.S. State Department concluded that FARC committed " 'bombings, murder, kidnaping, extortion, highjacking, as well as terrorist and conventional military action against Colombian political, military and economic targets.' "  Comp. ¶ 185.  Plaintiffs allege that FARC opposes the influence of the United States in Colombia. Comp. ¶ 175.  Plaintiffs also allege that FARC has been responsible for most of the ransom kidnapings in Colombia, targeting wealthy landowners, foreign tourists, prominent international and domestic officials and ordinary civilians. Comp. ¶ 176.  Plaintiffs claim that FARC has a history of kidnaping Americans, specifically that it kidnaped twenty-three Americans between 1994 and 1997. Comp. ¶ 181.  Plaintiffs further assert that all five American missionaries in this case were kidnaped, held hostage, and eventually murdered by FARC, which was confirmed by the Colombian National Prosecutor's Office in 2007. Comp. ¶ 49-148, 171.  Plaintiffs allegations are sufficient to state predicate acts of international terrorism pursuant to section 2331(1) of the ATA.

*Primary and Secondary Liability Under the ATA*

In Counts I-III, Plaintiffs plead claims for both primary and secondary liability under the ATA: Count I: civil aiding and abetting homicide and serious bodily injuries to United States nationals in violation of 18 U.S.C. § 2332 and 2333; Count II: conspiracy to violate 18 U.S.C. § 2332 in violation of 18 U.S.C. § 2333; Count III: providing material support to terrorists in

---

[5] The European Union and Colombian governments also designated FARC as a terrorist organization around 1997. Comp. ¶184.

violation of 18 U.S.C. § 2339A and in violation of 18 U.S.C. § 2333.

Extending liability to secondary actors is recognized under the ATA. See Linde, 384

F.Supp.2d at 583 (specifically holding that aiding and abetting liability and civil conspiracy

liability are available under the ATA); Stutts v. De Dietrich Group, 2006 WL 1867060 (E.D.N.Y.

2006) (discussing with approval the theory of secondary liability under the ATA but dismissing

claim for insufficient allegations of causation); Weiss v. National Westminster Bank PLC, 453

F.Supp.2d 609 (E.D.N.Y. 2006) (finding statutory secondary liability through violations of §§

2339B-C, without deciding whether aiding and abetting liability is available under 2333(a));

Strauss v. Credit Lyonnais, S.A., 2006 WL 2862704 (E.D.N.Y. 2006) (same); Morris v. Khadr,

415 F.Supp.2d 1323, 1330 (D. Utah 2006) (holding that civil liability under the ATA extends to

aiders and abettors who provide money to terrorists, approving Boim v. Quranic Literacy Inst.

and Holy Land Foundation For Relief And Development, 291 F.3d 1000 (7th Cir. 2002) (Boim

I)).

The only case refusing to recognize "secondary liability" under the ATA[6], Boim v. Holy

Land Foundation for Relief and Development, 549 F.3d 685 (7th Cir. 2008) (Boim III),

nonetheless held that liability under the ATA can be extended to secondary actors by adopting a

"chain of explicit statutory incorporations by reference" from §§ 2333(a) to 2331(1) to 2339A to

2332.  See id. at 690-92.  The majority referred to this as "primary liability," but explained that

"[p]rimary liability in the form of material support to terrorism has the character of secondary

_____

[6] In Boim III, the Seventh Circuit cites the Supreme Court's holding in Central Bank of
Denver v. First Interstate Bank of Denver, 511 U .S. 164 (1994), in reaching its conclusion.
Judge Posner reasoned that Central Bank stands for the proposition that "statutory silence on the
subject of secondary liability means there is none." Boim III, 549 F.3d at 688.

19

liability.  Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors."  Id. at 691-92.  Judge Rover, concurring in part and dissenting in part, described the majority's opinion as "straddl[ing] both primary and secondary liability."  Id. at 707, n. 5.  Moreover, the majority goes on to say that "there is no impropriety in discussing" such secondary liability theories as conspiracy and aiding and abetting in reference to the liability of donors to terrorism under § 2333.  Id. at 691.

To be liable under either theory of concerted action liability, whether it be aiding and abetting or conspiracy, the defendant must, among other things, "know the wrongful nature of the primary actor's conduct," and the conduct must be tied to a substantive cause of action.  In re Terrorist Attacks on September 11, 2001, 462 F.Supp.2d 561, 563 (S.D.N.Y. 2006) (citations omitted).

*a. Aiding and abetting*

The Restatement (Second) of Torts § 876(b) provides that, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  The United States Court of Appeals for the District of Columbia Circuit set forth the scope of civil aiding and abetting liability in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983).  The United States Supreme Court has described Halberstam as a "comprehensive opinion on the subject."  See Central Bank, 511 U .S. at 181.  To support a civil aiding and abetting claim, Plaintiffs must show:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the

20

defendant must knowingly and substantially assist the principal violation

Halberstam, 705 F.2d at 477; Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386 (11th

Cir. 1994).  See also Burnett v. Al Baraka Inv. & Dev. Corp., 274 F.Supp.2d 86, 105

(D.D.C.2003) (finding plaintiffs sufficiently alleged aiding and abetting under ATA where

complaint stated that defendant knowingly provided funds directly to terrorist organization in

furtherance of terrorist activities).

Additionally, the Eleventh Circuit held in Schneberger v. Wheeler, 859 F.2d 1477 (11th

Cir. 1988) that knowledge of the violation and of one's own role in the violation are required to

satisfy the test for aider and abetter.  Id. at 1480.  "This knowledge may be inferred from

circumstantial evidence." Id.  In particular, "if the method or transaction is atypical or lacks

business justification, it may be possible to infer the knowledge necessary for aiding and abetting

liability."  Woodward v. Metro Bank of Dallas, 522 F.2d 84, 97 (5th Cir. 1975)[7].

Here, Plaintiffs' allegations support aiding and abetting liability.  The Amended

Complaint alleges that the monetary instruments and weapons provided to FARC by Chiquita

provided substantial assistance[8] to international terrorism.  Plaintiffs' Amended Complaint

describes the wrongful acts performed by the FARC, Chiquita's general awareness of its role as

part of an overall illegal activity, and Chiquita's knowing and substantial assistance to the

principal violations.  These allegations are well within the mainstream of aiding and abetting

---

[7]In Bonner v. City of Pritchard, 661 F.2d 1206, 1207 & 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

[8] Chiquita's arguments regarding whether the assistance it provided was "substantial" is discussed in the causation section, infra.

liability. <u>See</u> <u>Halberstam</u>, 705 F.2d at 477.  Moreover, Plaintiffs' make detailed allegations of

"atypical practices" from which it is possible to infer knowledge necessary for aiding and

abetting liability pursuant to <u>Woodward</u>, 522 F.2d at 97.  These allegations include Chiquita

making furtive, secret payments, including large sums of cash personally transported and made

by a senior Chiquita employee on a regular basis; falsification of names and non-existent

employees on Chiquita's payroll to provide funds to regional FARC commanders on local

paydays; assistance in creating false front organizations and dummy corporations to channel

funds; creation of fictitious contracts with legitimate organizations or overvaluation of existing

contracts to bury secret payments in its bookkeeping; cooperation with FARC-controlled labor

unions, including Sintrabanano, to channel payments to FARC, funneling weapons to FARC and

assistance of the transport of weapons through Chiquita's local transportation contractors;

payments to AUC through intermediaries known as "convivirs"; making false and misleading

entries on its books and records; and filing false and/or misleading documents with the

Colombian and United States governments.  <u>See</u> Compl. ¶¶ 193-198, 202-206, 208, 212.

Plaintiffs have sufficiently alleged aiding and abetting liability.


   *b.  Conspiracy*

   The elements of civil conspiracy include: (1) an agreement between two or more persons;

(2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused

by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act

was done pursuant to and in furtherance of the common scheme. <u>Halberstam</u>, 705 F.2d at 477;

<u>see</u> <u>Linde</u>, 384 F.Supp.2d at 584.  A cause of action for civil conspiracy should allege the scope

of the conspiracy, its participants, and when the agreement was entered into. Sinaltrainal v.

Coca-Cola Co., 578 F.3d 1252, 1268 (11th Cir. 2009).   A complaint may justifiably be dismissed

because of the conclusory, vague and general nature of the allegations of conspiracy.  Fullman v.

Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984).

 Chiquita cites to the district court opinion in In re Sinaltrainal Litigation, 474 F.Supp.2d

1273 (S.D. Fla. 2006), aff'd in part, vac'd in part, rem'd, Sinaltrainal v. Coca-Cola Co., 578 F.3d

1252 (11th Cir. 2009), for its position that allegations of names, dates, and locations of a

conspiracy are required to be plead with particularity to survive a motion to dismiss.  While the

Eleventh Circuit's opinion in Sinaltrainal affirmed the district court's ruling that the plaintiffs

allegations of civil conspiracy under the ATS and TVPA were insufficient, the Eleventh Circuit's

decision was not premised on the lack of specificity in the allegations regarding these items.

Rather, the dismissal was based upon the failure of "plaintiffs' attenuated chain of conspiracy . . .

to nudge their claims across the line from conceivable to plausible" and plaintiffs' failure to

define "the scope of the conspiracy and its participants." Sinaltrainal, 578 F.3d at 1268.  There is

no analysis in the Eleventh Circuit's opinion of the elements of a civil conspiracy claim, nor any

indication that it was retreating from its adoption of Halberstam for the necessary elements to

sufficiently plead a civil conspiracy. See, e.g., Cabello v. Fernandez-Larios, 402 F.3d 1148, 1159

(11th Cir. 2005); Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386 (11th Cir. 1994).

 Here, the Court finds that Plaintiffs' allegations are sufficient to state a claim for

conspiracy liability.  Plaintiffs adequately allege that Chiquita, knowing that FARC was a

terrorist organization, intentionally agreed to provide money, weapons, and services to it as part

of a common scheme to subvert local trade unions, protect Chiquita's farms and shipments, harm

Chiquita's competitors, strengthen FARC's military capabilities, and that Plaintiffs were injured by overt acts done in furtherance of the common scheme.  It is not necessary that Plaintiffs allege that Chiquita either planned, intended, or even knew about the particular act which injured a plaintiff. See Linde, 384 F.Supp.2d at 584; Halberstam, 705 F.2d at 487.  The factual allegations of the Amended Complaint, detailing extensively coordinated secret payments and fraudulent concealment, sufficiently support an inference of the conspiracy between Chiquita and FARC and of Chiquita's knowing and intentional participation in the agreement's illegal goals.  "[T]he existence of the conspiracy agreement does not have to be proven by direct evidence.  Instead, it can be inferred from " 'the conduct of the alleged participants or from circumstantial evidence of the scheme.' " Cox, 17 F.3d 1386, 1410-11, quoting United States v. LeQuire, 943 F.2d 1554, 1562 (11th Cir. 1991) (quoting United States v. Ard, 731 F.2d 718, 724 (11th Cir. 1984)), cert. denied, 112 S.Ct. 3037 (1992).

    *c.  Primary liability under 2339A*

Plaintiffs claim that Chiquita provided material support, in the form of money, weapons, and services, to the FARC, which perpetrated the kidnaping and murder of the American missionaries.  Section 2339A of Title 18 of the United States Code created a civil cause of action for those injured by terrorist acts against individuals who provided support to terrorist groups. Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 318 (2nd Cir. 2007).  Section 2339A of the ATA provides: "whoever provides material support or resources ..., knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332]," shall be guilty of a federal crime.  Section 2332 of the ATA, in turn, criminalizes the killing (whether classified as homicide, voluntary manslaughter, or involuntary manslaughter), conspiring to kill,

or inflicting bodily injury on, any American citizen outside the United States.

Under the ATA, material support includes provision of currency or monetary instruments, weapons, transportation, and false documentation. 18 U.S.C. §§ 2339A(b). See Owens v. Republic of Sudan, 412 F.Supp.2d 99, 108 (D.D.C. 2006) (denying motion to dismiss claim where plaintiffs alleged that defendants provided resources listed in 2339A(b)).  Assuming such support is alleged, Plaintiffs will have to present a sufficient causal connection between that support and the injuries suffered by Plaintiffs.[9] In re Terrorist Attacks, 462 F.Supp.2d at 563.

The Court first notes that Chiquita's memorandum in support of its motion to dismiss (DE 32) does not address whether Plaintiffs have sufficiently pled a violation of § 2339A as a basis for liability.  Thus, any Rule 12(b)(6) challenge to Count III of the Amended Complaint may be deemed waived on this basis alone.  Nonetheless, even if the Court were to allow Chiquita's § 2339A challenge (which is first raised in its reply brief), the Court finds that Plaintiff's 2339A claim has been adequately pled.

Plaintiffs have pled that Chiquita provided resources to FARC which are prohibited by § 2339A, including money, weapons, and false documentation.  Chiquita argues, however, that it did not have the requisite scienter for liability.  The statute prohibits provision of material support or resources **knowing or intending** that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332].  Chiquita claims it did not intend that FARC use the money and weapons to kidnap and murder Americans.  First, the question of Chiquita's intent is one of fact, and cannot be determined as a matter of law on a motion to dismiss.  Second, Plaintiffs have alleged sufficient facts from which a trier of fact can conclude that Chiquita had

_____

[9] The parties' arguments regarding causation is discussed in the following section.

the requisite knowledge.  "The mental element required to fix liability on a donor to [a terrorist

organization] is therefore present if the donor knows the character of that organization."  Boim

III, 549 F.3d at 695.  As the Seventh Circuit explained in Boim III,

> To give money to an organization that commits terrorist acts is not intentional
> misconduct unless one either knows that the organization engages in such acts or
> is deliberately indifferent to whether it does or not, meaning that one knows there
> is a substantial probability that the organization engages in terrorism but one does
> not care.

Id. at 693.

The Boim III opinion characterized "know[ing] there is a substantial probability that the

organization engages in terrorism but one does not care" as "recklessness" or "wantonness,"

explaining, " '[w]hen the facts known to a person place him on notice of a risk, he cannot ignore

the facts and plead ignorance of the risk.' " Id. (quoting Makor Issues & Rights, Ltd. v. Tellabs

Inc., 513 F.3d 702, 704 (7th Cir.2008).  Similarly, in Goldberg v. UBS AG, --- F.Supp.2d ----,

2009 WL 3077118 (E.D.N.Y. 2009), the court held that plaintiffs allegations met the mens rea

requirement where "plaintiffs sufficiently pled that the defendant consciously disregarded the fact

that it was supporting a terrorist organization, despite a strong probability that the bank's services

would be used to further the organizations's terrorist activities." Id. at * 14.  Here, Plaintiffs

allege in the Amended Complaint that, "[f]rom 1989 through at least 1997, Chiquita made

numerous and substantial secret payments to FARC, and also provided FARC with weapons,

ammunition and other supplies through its transportation contractors.  Chiquita did so knowing,

or consciously avoiding, the fact that FARC was a violent terrorist organization.." Comp. ¶ 191.

Under both the plain language of the statute and the Boim III opinion, Plaintiffs have alleged a

sufficient level of mens rea on Chiquita's part in providing currency and weapons to FARC.

*Causation*

Lastly, the Court will address the issue of causation under the ATA.   Section 2333 of the ATA provides a cause of action for those injured "**by reason of** an act of international terrorism." (emphasis added).  Plaintiffs have to allege a sufficient causal connection between Chiquita's alleged support of terrorism and the injuries suffered by Plaintiffs.  In re Terrorist Attacks, 462 F.Supp.2d at 563 (citing Burnett v. Al Baraka Inv. & Dev. Corp., 274 F.Supp.2d 86, 104 (D.D.C. 2003).

Proximate cause will support this connection. Id. (citing In re Terrorist Attacks on September 11, 2001, 349 F.Supp.2d 765, 826 (S.D.N.Y. 2005); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir.1994)).  But-for causation is not required under the ATA.  Linde, 384 F. Supp. 2d at 584-85; Weiss, 453 F.Supp.2d 631; Boim III, 549 F.3d at 695-97.  As the district court stated in Linde:

> Defendant's protestations about causation and knowledge are contrary to these principles. Just as there was no requirement for aiding and abetting liability in Halberstam that the murderer would not have acted as he did but for his co-defendant's conduct, there is no requirement of a finding that the [terrorist] would  not, or could not, have acted but for the assistance of [defendant].

384 F. Supp. 2d at 584-85.   Similarly, in both Weiss, 453 F.Supp.2d at 631, Strauss, 2006 WL 2862704, *17-18, and Goldberg, 2009 WL 3077118, *15, the courts held that the statutory phrase "by reason of" should be interpreted to require a plaintiff to show that the defendant's actions were the proximate cause of the plaintiff's injuries.  The court in Weiss explained its reasoning as follows:

> Defendant argues that plaintiffs cannot prevail merely by showing that defendant provided material assistance or funding to the terrorist organization responsible for perpetrating the attacks which injured the plaintiffs. Rather,

27

defendants argue, plaintiffs must allege, for example, that the funds supplied by the defendant were used to buy the specific weapons and train the specific men who killed or injured the plaintiffs.

However, taking into account the legislative history of these statutes and the purpose behind them, proximate cause is not so limited. Congress intended these provisions to impose, "liability at any point along the causal chain of terrorism." S.Rep. No. 102-342 at 22. In enacting the material support statute Congress made an express finding of fact that, "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). As the Ninth Circuit has noted, "money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts." Humanitarian Law Project v. Reno, 205 F.3d at 1136; see also Linde, 384 F.Supp.2d at 585 (holding that in order to prevail on claims under 2333(a) it was sufficient for plaintiffs to show that "[defendant] provided these services to the particular group responsible for the attacks giving rise to their injuries.").

453 F.Supp.2d at 631-32.

The court in Strauss also concluded that but-for causation is inconsistent with the ATA "[b]ecause money is fungible, it is not generally possible to say that a particular dollar caused a particular act or paid for a particular gun. If plaintiffs were required to make such a showing, 2333(a) enforcement would be difficult that the stated purpose would be eviscerated." Strauss, 2006 WL 2862704, *18. "Rather, where the provision of funds to a terrorist organization is a substantial factor in carrying out terrorist acts, it is thus the proximate cause of the terrorist attacks engaged in the organization." Id. As the Eleventh Circuit recently held, "[i]f a reasonably prudent person could foresee that a harm like the one that the plaintiff suffered might result from his or her actions, then there is proximate causation." Zivojinovich v. Barner, 525 F.3d 1059, 1069 (11th Cir. 2008). See also Goldberg, 2009 WL 3077118, *16 ("A fact finder could plausibly find that it was entirely foreseeable that transmitting money to a terrorist organization would lead to violence and Congress had precisely that lethal connection in mind in passing the ATA.").

28

To sufficiently allege proximate cause, Plaintiffs must also allege that their payments to FARC occurred prior to, not subsequent to, the kidnapings at issue, which occurred in 1993 and 1994. See Weiss, 453 F.Supp.2d at 631 ("While defendant is correct that a transaction which occurred after a terrorist attack cannot be the proximate cause of that attack, because each attack was preceded by at least one relevant transaction by [defendant], plaintiffs have sufficiently alleged that each attack was proximately caused by [defendant].").  Here, Plaintiffs allege that FARC, established in 1964 by the Colombia Communist Party as its "military wing," is Colombia's largest rebel group and has committed thousands of ransom kidnapings in Colombia. Compl. ¶¶ 173, 174, 176, 180.  In addition to kidnaping twenty-three Americans between 1994 and 1997 alone, FARC has also committed many murders, including killing Americans.  Compl. ¶¶ 180-82.  Further, Plaintiffs allege that Chiquita knowingly and intentionally supplied secret monthly payments of between $20,000 and $100,000 to FARC over an eight-year period beginning in 1989 (four years before the first kidnaping at issue), and continuing through at least 1997, knowing, or consciously avoiding, the fact that FARC was a violent terrorist organization. Compl. ¶ 191-92.  Over time, the payments were fixed to a percentage of Banadex's gross revenues, with as much as ten percent of its gross revenue being diverted to FARC. Compl. ¶ 192.  Plaintiffs also allege that Chiquita supplied FARC with weapons, ammunition and other supplies through its transportation contractors. Compl. ¶ 191.  Based on the allegations in the Amended Complaint, the Court rejects Chiquita's argument that it should rule as a matter of law that the assistance allegedly provided to FARC by Chiquita is not substantial because of FARC's vast resources.  Plaintiffs have alleged sufficient facts from which a reasonable trier of fact could conclude that Chiquita's actions of providing material support to FARC would fund some of

FARC's terrorist activities, including the kidnapings and murders of Americans.  Thus, Plaintiffs

have sufficiently alleged proximate causation. See Zivojinovich, 525 F.3d at 1069; see also Boim

III, 549 F.3d at 698 (holding that a donor of even $1,000 to a terrorist organization would be

liable because "[t]he knowing contributors as a whole would have significantly enhanced the risk

of terrorist acts and thus the probability that the plaintiff's decedent would be a victim.").

*Plaintiffs' State Law Claims*

In addition to Plaintiffs' claims under the ATA, Plaintiffs allege several causes of action

under state law.  These consist of the following: Wrongful Death pursuant to the Florida

Wrongful Death Act (Counts 4-6, 8); Wrongful Death under Nebraska law (Count 7); Aiding and

Abetting Wrongful Death pursuant to the Florida Wrongful Death Act (Counts 9-11, 13); Aiding

and Abetting Wrongful Death under Nebraska law (Count 12); False Imprisonment (Counts 14,

23); Aiding and Abetting False Imprisonment (Counts 15, 24); Intentional Infliction of

Emotional Distress (Count 16, 19); Aiding and Abetting Intentional Infliction of Emotional

Distress (Counts 17, 20); Negligent Infliction of Emotional Distress (Count 18); Assault (Count

21); and Aiding and Abetting Assault (Count 22).

*a. Statute of Limitations*

Defendant moves to dismiss Plaintiffs' state law claims (Counts IV-XXIV) on the

grounds that they are barred by the applicable statute of limitations.  Plaintiffs argue that the

Florida claims are still viable based on the principle of equitable estoppel, and that the Nebraska

claim is still viable under the principles of equitable estoppel and the equitable doctrine of

fraudulent concealment.[10]

In <u>Major League Baseball v. Morsani</u>, 790 So.2d 1071 (Fla. 2001), the Florida Supreme

Court stated:

> Equitable estoppel ... comes into play only after the statute of limitations has run
> and addresses itself to the circumstances in which a party will be estopped from
> asserting the statute of limitations as a defense to an admittedly untimely action
> because his conduct has induced another into forbearing suit within the applicable
> limitations period.

<u>Id.</u> at 1079.  To raise an equitable estoppel claim in response to a statute of limitations, clearly

established Florida case law requires the plaintiff to allege "that the defendant willfully induced

the plaintiff to forego suit until after the limitations period has ended." <u>Fox v. City of Pompano</u>

<u>Beach</u>, 984 So.2d 664, 667 (Fla. 4th DCA 2008).  As another Florida appellate court explained,

"[e]quitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer

prevails upon the other to forego enforcing his right until the statutory time has lapsed." <u>Acoustic</u>

<u>Innovations, Inc. v. Schafer</u>, 976 So.2d 1139, 1144 (Fla. 4th DCA 2008) (<u>quoting</u> <u>Cook v.</u>

<u>Deltona Corp.</u>, 753 F.2d 1552, 1563 (11th Cir. 1985), in turn <u>quoting</u> <u>Aldrich v. McCulloch</u>

<u>Props., Inc.</u>, 627 F.2d 1036, 1043 n. 7 (10th Cir. 1980)); <u>see also</u> <u>Brooks Tropicals, Inc. v.</u>

<u>Acosta</u>, 959 So.2d 288, 293 (Fla. 3d DCA 2007); <u>Aboujaoude v. Poinciana Development Co. II</u>,

---

[10] For their Florida claims, Plaintiffs are not proceeding under the doctrine of equitable
tolling. <u>See</u> Resp. at 36.  The Florida tolling statute sets forth the limited circumstances under
which the statute of limitations may be tolled.  The statute explicitly precludes application of any
tolling provision not specified by the legislature. <u>See</u> Fla. Stat. § 95.051.  Fraudulent concealment
of the identity of the tortfeasor is not an enumerated circumstance under the tolling statute and
therefore cannot toll the statute of limitations. <u>See</u> <u>Putnam Berkley Group, Inc. v. Dinin</u>, 734
So.2d 532 (Fla. 4th DCA 1999) (fraudulent concealment of identity of tortfeasor is not
enumerated circumstance to toll statute of limitations under Florida law); <u>Lee v. Simon</u>, 885
So.2d 939 (Fla. 4th DCA 2004) (Statute of limitations began to run when decedent died, as
representative knew both of death and that tort may have occurred, even though representative
did not know identity of tortfeasor).

31

509 F.Supp.2d 1266 (S.D. Fla. 2007).

Here, Plaintiffs have not alleged sufficient facts which would allow the application of equitable estoppel.  Plaintiffs do not allege that they knew the basis for their suit before the limitations period ended, that they intended to file a claim against Chiquita within the applicable limitations period, and that they were then "induced" or "prevailed on" by Chiquita to forego filing such a suit.  Absent such allegations, Plaintiffs claims pursuant to Florida state law (Counts 4-6, 8-11, 13-24) are barred by the applicable statute of limitations.

Plaintiff's remaining state law claims, Wrongful Death under Nebraska law (Count 7) and Aiding and Abetting Wrongful Death under Nebraska law (Count 12) allege that Chiquita is liable for damages under the Nebraska wrongful death statute, Neb.Rev.Stat. § 30-809.  This action has a two-year statute of limitations. See Neb.Rev.Stat. § 30-810.  However, Nebraska law recognizes equitable tolling of the statute of limitations based upon fraudulent concealment.  See Andres v. McNeil Co., Inc., 270 Neb. 733, 707 N.W.2d 777 (Neb. 2005); Muller v. Thaut, 230 Neb. 244, 430 N.W.2d 884 (Neb. 1988) (applying the doctrine to Nebraska's wrongful death statute).  The Court has already concluded that Plaintiffs have sufficiently pled the equitable doctrine of fraudulent concealment to avoid application of the statute of limitations as a matter of law.  See infra.  Similarly, Plaintiff's claims pursuant to Nebraska law (Counts 7 and 12) cannot barred, as a matter of law, by the applicable statue of limitations.

b. *Nebraska Wrongful Death claims*

Plaintiff's claims for Wrongful Death under Nebraska law (Count 7) and Aiding and Abetting Wrongful Death under Nebraska law (Count 12), while pled as two causes of action, appear to be substantively identical claims.  That is, both allege that Defendant is liable for

32

damages under the Nebraska wrongful death statute, Neb.Rev.Stat. § 30-809, for aiding and abetting the wrongful death of Stephen Welsh.

Section 30-809 provides:

Whenever the death of a person shall be caused by the wrongful act, neglect or default, of any person, company or corporation, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

The intent of this statue is "to authorize an action to recover damages from a tort-feasor for negligence or some other action resulting in the death of another person." Olsen v. Farm Bureau Ins. Co. of Nebraska, 259 Neb. 329, 609 N.W.2d 664 (Neb. 2000).

Nebraska courts have not addressed the issue of secondary liability under the wrongful death statute. However, the Ohio courts, in examining Ohio's nearly identical wrongful death statute, held that a complaint states a valid claim when it alleges that the defendant aided and abetted the commission of a wrongful act which causes another's death. See Burton v. DePew, 47 Ohio App.3d 107, 547 N.E.2d 995 (Ohio App. Ct. 1988) (holding that the trial court erred when dismissing a claim for aiding and abetting wrongful death); see also Fed. Mgt. Co. v. Coopers & Lybrand, 137 Ohio App.3d 366, 381, 738 N.E.2d 842 (Ohio App. Ct. 2000) (a claim for aiding and abetting wrongful death is itself a form of wrongful death claim). Since the Nebraska courts have yet to examine the issue, this Court, at the present time, adopts the reasoning of the Ohio courts, and concludes that aiding and abetting a wrongful death is a valid claim under Nebraska's wrongful death statute. Here, Plaintiffs have sufficiently alleged that

33

Chiquita's provision of money and weapons to FARC aided and abetted the commission of the kidnapings and murders at issue, including the murder of Stephen Welsh. See supra. Accordingly, Chiquita's motion to dismiss Plaintiffs' claim under the Nebraska wrongful death statute is denied.

*Conclusion*

Defendant's Motion to Dismiss Amended Complaint (DE 31) is **GRANTED IN PART AND DENIED IN PART**. Counts 4-6, 8-11, and 13-24 are dismissed. Defendant's motion to dismiss the remaining claims is denied.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 4th day of February, 2010.

_____
KENNETH A. MARRA
United States District Judge

Copies furnished to:
all counsel of record

34